35 P.(2d) 285

**STATE v. BURRUS.**

No. 3952.

Supreme Court of New Mexico.

April 24, 1934.

Rehearing Denied Aug. 13, 1934.

C. C. Catron, John J. Kenney and Earl D. Kenney, all of Santa Fé, for appellant.

E. K. Neumann, Atty. Gen., and Frank H. Patton, Asst. Atty. Gen., for the State.

HUDSPETH, Justice.

Appellant was convicted of voluntary manslaughter for the shooting of Apolonio Pino, and sentenced to a term in the penitentiary of not less than nine, nor more than ten, years. From his conviction and sentence he prosecutes this appeal.

On Sunday afternoon, March 12, 1933, defendant, Robert Burrus, a member of the police force of the city of Santa Fé, went to the "Esquibal Place," a so-called "bootleg joint" on Read street in Santa Fé, for a glass of beer. He had been sitting in the kitchen of the house, drinking beer with a group of people for an hour or so, when the deceased, city marshal, followed by George Romero of the police force, entered the house, went into the kitchen and over to where defendant was sitting, and demanded of defendant that he give up his policeman's badge. Burrus said something to the effect that, "I never saw any Mexican son of a bitch that could take the badge away from me," and deceased attempted to grab the badge from defendant's coat. With this, Burrus jumped up from his chair, and both he and deceased drew guns. Romero grabbed hold of Burrus, and deceased then backed out of the kitchen and disappeared. A few moments later Romero released Burrus, and the latter left the room, went out into the patio, re-entered the house in search of Pino, and, passing the toilet, where Pino had hidden, stopped, kicked on the toilet door, and demanded of Pino that he come out. At this point the shooting commenced. The evidence is conflicting as to who fired the first shot. Six shots were fired through the toilet door by Pino and three by Burrus before Pino was struck by the bullet from defendant's gun from which he died three days later.

Appellant, arrested for the shooting that evening, was released on bail after a preliminary hearing held on March 21st. An amended criminal information, charging murder in the first degree, was filed on April 3d, and on

the same day defendant moved for a continuance. Defendant's motion for a continuance was overruled, and the case was set for trial for April 10th.

■ The first point relied upon by appellant for reversal is that the trial court erred in overruling his motion for a continuance of the case until the September term of the court. The grounds upon which the motion was based were that there was not sufficient time for counsel to prepare defendant's case for trial on April 10th, and that, because of certain newspaper accounts and editorials relating to the recent shooting, public sentiment in Santa Fé county, where defendant had for years resided, and where he desired to be tried, was then hostile towards him. We have carefully examined the record and the exhibits relating to the motion, and are unable to agree with counsel that the record shows anything which would justify us in holding that the trial court abused its discretion in denying defendant's motion. As to the first ground upon which the motion was based, see Territory v. Price, 14 N. M. 262, 91 P. 733; State v. Renner, 34 N. M. 154, 279 P. 66; State v. Romero, 34 N. M. 494, 285 P. 497. As to the second ground, if prejudice did, in fact, exist against the defendant in Santa Fé county, a change of venue might have been obtained. No such application was made, however. What the state of public sentiment might be the following September was a matter of pure speculation which the trial court was not bound to indulge in.

■■ Appellant's next contention is that the trial court erred in overruling his challenge for cause of the juror Frank Tapia. After the overruling of defendant's challenge, made upon the ground that Tapia was biased and prejudiced in favor of the deceased, defendant exercised a peremptory challenge upon him. After eleven jurors had been chosen and defendant had used up his twelve peremptory challenges, the juror Romero was called. Defendant requested the court's permission to exercise an additional peremptory challenge upon Romero, but such additional challenge was refused. Appellant argues that the alleged error of the trial court thus prejudiced him in depriving him of one of the peremptory challenges to which, under section 78-132 of the 1929 Comp. St., he was entitled. The Attorney General urges that defendant cannot here avail himself of the alleged deprivation of one of his peremptory challenges, since it is not shown that the juror Romero, who was not challenged for cause after the refusal to allow the exercise of a peremptory challenge upon him, was legally disqualified, or that he was not fair and impartial. This point we are not called upon to decide, since we are of the opinion that the court's overruling of defendant's challenge for cause of the juror Tapia was not erroneous. There is nothing in the record of the voir dire examination of Tapia which indicates that Tapia, who was a friend and neighbor of the deceased, and who, upon questioning by counsel for the defense, admitted to a natural feeling of sympathy toward the deceased and his family, was in any way prejudiced against the defendant, or that he was not of a mind to render a verdict according to the evidence. True, under skillful questioning by counsel,

he at one point in his examination admitted to bias, but subsequent questioning by the court brought out the fact that he had not understood the meaning of the word "bias." When the meaning of the word was fully explained to him, he denied having such feeling. The trial court is necessarily invested with a wide discretion in the superintendence of the process of impaneling the jury. Territory v. Lynch, 18 N. M. 15, 133 P. 405. See, also, State v. Anderson, 24 N. M. 360, 174 P. 215. A careful reading of the searching voir dire to which Tapia was subjected fails to convince us of an abuse of discretion on the part of the trial court in overruling defendant's challenge for cause.

■ The third point relied upon by appellant for reversal is that the trial court erred in refusing to grant a new trial because of the alleged attempt by one of the bailiffs to intimidate the juror Taribio Rodriguez.

In his motion for a new trial, defendant alleged that the bailiff Seferino Alarid had followed the juror Rodriguez into the toilet before the verdict was rendered and had told him to "go for Pino." There was a sharp conflict in the testimony of the witnesses who testified at the hearing ordered by the court for the investigation of the allegations of the motion, and, at the conclusion thereof, the trial court found that the alleged statement was never in fact made, and that "the alleged charge of tampering or attempting to influence the said juror Taribio Rodriguez by the said bailiff Seferino Alarid is without foundation in fact." The trial court's finding, being supported by substantial evidence, cannot be disturbed by this court. Appellant's third point is therefore overruled.

■ Appellant's fourth point is directed to the alleged error of the trial court in limiting the cross-examination of the state's witness, Charles Fahy. The state had brought out on direct examination that the city marshal was invested with the power, under section 86 of the code of ordinances of the city of Santa Fé, 1930, to suspend a policeman temporarily. On cross-examination appellant sought to question the witness as to whether he knew of any ordinance which gave the marshal the right to make an assault upon a police officer or to "take the star off an officer by tearing it out of his coat." Whether or not the refusal of the court to permit these questions was correct we need not pass upon, being of the opinion that the error, if error there was, was not prejudicial to the defendant, and was cured when the trial court instructed the jury: " * * * That the deceased, Apolonio Pino, had no right by virtue of his office to remove from the person of the defendant by force the defendant's insignia of office, his police badge, and, if you find from the evidence that the deceased Apolonio Pino attempted by force to remove from the person of defendant the defendant's insignia of office, his police badge, then the deceased committed an unlawful assault upon the defendant by so doing."

■■ In his sixth point appellant contends that the trial court permitted the state too great a latitude in its cross-examination of him. The extent to which cross-examination will be permitted is a matter resting largely in

the discretion of the trial court. State v. Carter, 21 N. M. 166, 153 P. 271; State v. Cruz, 34 N. M. 507, 285 P. 500; State v. Roybal, 33 N. M. 540, 273 P. 919; State v. Martinez, 34 N. M. 112, 278 P. 210; State v. Stewart, 34 N. M. 65, 277 P. 22. The record indicates that the questions objected to were germane to matter which had been brought up by the defense itself and in rebuttal of inferences which might be drawn therefrom. Reversible error cannot therefore be predicated upon their allowance.

Appellant's last point alleges prejudicial error in the refusal of the court to give defendant's requested instruction No. 3. The contention is that the requested instruction was necessary to clarify a question raised by the trial court's charge as to whether the defendant had the burden of proving beyond a reasonable doubt the issue of self-defense. A careful perusal of the instructions given, and to which appellant interposed no objections, convinces us that this contention is without merit. The court charged the jury that the burden was upon the state to prove to their satisfaction, and beyond all reasonable doubt, all the material allegations of the information, including that that the killing was without legal excuse or justification, gave the usual definition of terms and the usual general instructions upon reasonable doubt and presumption of innocence. These instructions, coupled with instruction No. 13, applying the principles of the law of self-defense, as explained elsewhere in the instructions, to the evidence, preclude any implication that the burden might be upon the defendant to establish his defense beyond all reasonable doubt. When a correct general instruction as to reasonable doubt is given, it need not be repeated in dealing with each element of the case. State v. Roybal, 33 N. M. 187, 262 P. 929, and cases therein cited.

Finding substantial evidence in the record to sustain the verdict rendered by the jury, and finding no reversible error in the conduct of the trial of the case, the judgment appealed from will be affirmed.

It is so ordered.

WATSON, C. J., and SADLER, BICKLEY, and ZINN, JJ., concur.

On Motion for Rehearing.

HUDSPETH, Justice.

The motion for rehearing presents, and an unusually able and interesting brief urges, that it was error, not only reversible but jurisdictional, to submit to the jury the question of appellant's guilt of voluntary manslaughter, upon this information, which contains a single count, and that charging murder in the first degree.

Appellant did not object to the instruction nor to the receipt of the verdict. He did move in arrest of judgment, on the ground stated. No point was made of it on the original presentation here. It is of course for appellant to demonstrate that the point is now available. This burden he has assumed. We consider the legal point of such importance and so much in need of clarification that we proceed directly to it, without any

expression as to its present availability in appellant's defense.

The controlling statute is 1929 Comp. St. § 35-4409. Originally (Laws 1925, c. 145, § 9) it lacked the proviso now appearing at the end of it. The proviso was added at the first opportunity after the decision in State v. Taylor, 33 N. M. 35, 261 P. 808, where the section was considered in its original form.

Appellant must here combat the applicability of a statutory provision: "The jury trying the cause may find the defendant or defendants guilty of any offense the commission of which is necessarily included in that with which he or they are charged." And, in doing so, he is faced with the declaration of this court: "Voluntary manslaughter is necessarily included within a charge of murder." State v. Parker, 34 N. M. 486, 285 P. 490, 492. Appellant undertakes to show that the statute does not apply and that the declaration was erroneous.

Appellant does not question, what is known to all, that the practice pursued in the case at bar had prevailed in this jurisdiction from the beginning, and that it was in supposed conformity to the common law. It seems never to have been challenged in this court until attacked in State v. Parker, supra. There it was claimed to be opposed to Laws 1925, c. 145, and to State v. Taylor, supra. We overruled the contention as there made, holding that the statute in its original form required "that each grade of felonious homicide be set out in a separate count;" but that the requirement was not jurisdictional and was waived by failure to object seasonably.

Appellant's contentions may perhaps be reduced to this: As the law of England had developed up to the time of the separation, on an indictment for murder, if the facts warranted, it was the duty of the judge to submit and of the jury to convict of manslaughter. But: (1) By codification of the substantive law of homicide, particularly in 1907, we removed the reason for the English rule which became American common law; and (2) by enactment of Laws 1925, c. 145, we expressly abolished the rule; and (3) we did not restore it by the proviso of 1929 (Laws 1929, c. 48, § 1).

1. Appellant urges that, at that stage of English law which we recognize as our common law, the generic offense was unlawful homicide, of which murder and manslaughter were grades or degrees; that the distinction between the two was the presence or absence of malice aforethought; that every homicide was prima facie murder, it being for the accused to reduce his offense to manslaughter if he could not excuse or justify it; that, as a necessary result of this, murder was the proper charge to lodge against one who had killed because he was presumed to have known and to have intended the natural and necessary consequences of his act; that it followed also that there might and sometimes should be a conviction of manslaughter, since the accused had the right to overcome the presumption and to disprove the malice or raise a reasonable doubt regarding it.

We do not question this. Indeed, we are persuaded that appellant correctly represents both the substantive and the adjective law,

and that he truly locates in the former the reason for the latter.

But, the argument proceeds, we changed this when in 1907 we codified the substantive law of homicide. Felonious homicide ceased to be the generic offense. Murder and manslaughter emerged, each as a generic offense, the latter repugnant to the former, because it "must lack the very element—malice aforethought—which would make any unlawful killing murder." This does not strike us so forcibly and no precedent is shown for the reasoning.

We fail to perceive how or why felonious homicide is any less the generic offense under our statute than at the common law. According to appellant's own showing, it was not, at common law, an offense in the sense that one could be charged with or convicted of it. The charge was murder, and the conviction thereunder was murder or manslaughter. So, by our statute, the generic offense, in the sense employed, is the "unlawful killing of a human being." If done "with malice aforethought, either express or implied," it is "murder." 1929 Comp. St. § 35-301. If done "without malice," it is "manslaughter." Id. § 35-305. We deal with the same general subject or generic offense, culpable homicide. We use the same terms, murder and manslaughter. We preserve the same distinction, the presence or absence of malice. The relation between the two is just what it was at the common law. If the absence of malice in manslaughter renders that offense repugnant to murder, which requires malice, the same repugnancy existed at the common law.

Quoting from Odger's The Common Law of England (2d Ed.) vol. 1, p. 273, appellant gives us this classification:

"Homicide is of four kinds:—

"(1) Murder; where a man unlawfully causes the death of another with malice aforethought, express or implied.

"(2) Manslaughter; where a man unlawfully causes the death of another, but without malice aforethought, express or implied.

"(3) Justifiable; where death is lawfully inflicted.

"(4) Excusable; where death is accidental."

This would serve to-day as a fair classification under our statute, allowing for a few innovations not material to the argument.

In codifying homicide we have preserved, in the primary definitions, the very language in which the common-law writers were accustomed to define murder and manslaughter. We cannot see that the further classification of both offenses affects the argument. The idea that each is now a distinct and generic offense, while formerly both were grades or degrees of an all-embracing generic offense, must spring from the conception that the absence of malice is an affirmative element to be shown before there can be a conviction of manslaughter, instead of a residuum of guilt remaining after the malice of murder is eliminated. Nothing that we have done, legislatively or judicially, supports that idea.

Our acquiescence in the statement that at the common law every homicide was prima facie murder does not imply the existence then or now of a presumption against innocence. We are not aware that it meant more then than it means to-day.

"Thus the state is not required, in order to make out a prima facie case of murder, to prove (in addition to the killing of the deceased by the defendant) that the defendant was not so insane as to be wanting in criminal capacity, or that the killing was not an accident, or that it did not result from the privileged use of deadly force, or that it did not result from the sudden heat of passion engendered by great provocation, or other matters of this kind. To require such proof, moreover, would constitute an absurd waste of time. This difficulty is avoided by a rule of law in the form of a presumption. It has sometimes been said that every homicide is presumed to have been with malice aforethought and that it devolves upon the prisoner to prove circumstances which will justify, excuse or mitigate the act. This, however, is quite generally recognized to be an overstatement of the position. If the evidence introduced by the state, while showing the killing of the deceased by the defendant, should at the same time establish some basis of justification or excuse, the defendant would be entitled to a directed verdict of acquittal without the introduction of evidence on his part. Hence, it is necessary to put the matter in this form:—Every homicide is presumed to have been committed with malice aforethought unless the evidence which proves the killing itself shows it to have been done without malice." A Re-examination of Malice Aforethought, by Professor Rollin M. Perkins, 43 Yale Law Journal, p. 550.

The principle is just as sound now as at the common law. If the state believes that the killing involves malice, the proper charge is murder. If the accused, unable to justify or excuse, is able to mitigate, the verdict of manslaughter must be available. No protection or benefit would inure to the accused by requiring the state to include a separate count for manslaughter merely as a position to which it might retire if necessary.

2. We have already held in accordance with appellant's contention that the statute of 1925 changed the rule as a matter of adjective law. In State v. Parker, supra, we recognized a legislative intent "that each grade of felonious homicide be set out in a separate count." We need not pursue appellant's contention that we erred in holding that the new requirement was not jurisdictional and might be waived.

3. Did the Legislature restore the former rule by the proviso of 1929? Part of appellant's argument here is defeated by our inability to concede that murder and manslaughter are differently related than at the common law, or in any different or larger sense distinct offenses. Pursuing that basic thought, which we reject, appellant considers that murder and manslaughter are "different offenses" the accused may be guilty of by "the same acts," rather than "different forms or degrees" of the "same offense." Cf. 1929 Comp. St. § 35-4409. In both of those cases

the original section, while prohibiting charging more than one offense in the information, yields to permit charging the "different offenses" or "different forms or degrees" in separate counts.

The real question is whether manslaughter is an offense the commission of which is "necessarily included" in the murder with which appellant was charged, within the meaning of the proviso. It is readily to be perceived that the two offenses are distinct in the sense that manslaughter was not committed in committing the higher offense of murder. If murder was committed, there was no manslaughter. But that is not the point. The lesser need not be committed in the perpetration of the greater. The commission of the lesser need only be "necessarily included" in the offense charged. The charge that there was an unlawful killing from malice aforethought, which constitutes murder, embraces the several elements, the killing, the unlawfulness of it, and the malice of it. On each element the accused is put to trial. As to any of them the proof may fail. If there was no killing or if it was not unlawful, there is no guilt. If there was a killing and it was unlawful but without malice, there is guilt of manslaughter. In that sense, murder as defined in law necessarily includes manslaughter as defined in law.

Much stress is placed upon the fact pointed out in State v. Taylor, supra, and frequently since, that the 1925 act was taken from Oklahoma, and upon the further fact, apparent from a reading of the Taylor opinion, that the proviso is in the language of the "distinct statutory provision" of Oklahoma therein quoted. "Necessarily included," it is urged, according to controlling Oklahoma decisions, has a special meaning. This we pointed out in the Taylor Case and need not here repeat.

It is not held in Oklahoma, however, that manslaughter is not necessarily included in the charge of murder. The contrary is held. Rhea v. Territory, 3 Okl. Cr. 230, 105 P. 314; Cochran v. State, 4 Okl. Cr. 379, 111 P. 974. It is also held that assault with intent to do great bodily harm is necessarily included in assault with intent to kill. Hickman v. State, 32 Okl. Cr. 307, 240 P. 1097. These decisions show that, according to Oklahoma jurisprudence, where the distinction between two offenses is in the intent with which the act was done, the offense involving the more innocent intent is necessarily included in the other.

Appellant points to the necessity of pleading "the acts constituting the offense" rather than the offense as defined. Cf. 1929 Comp. St. § 35-4406. He then says that not every murder necessarily includes a manslaughter; that homicide by poison, lying in wait, or torture is scarcely susceptible of reduction to manslaughter; that unless murder, in every state of facts and by whatever means accomplished, embraces within it a possible manslaughter, the latter cannot be "necessarily included" in a charge of the former.

This same situation existed at the common law. But the fact that the means employed in or the circumstances of a particular homi-

cide precluded reduction to manslaughter did not change the result that murder, as such, embraces manslaughter. As appellant himself contends, the criterion is not whether the particular facts pleaded include a lesser offense; it is whether the larger offense in its nature, elements, and definition includes the lesser.

Before the 1929 proviso was adopted, the original 1925 act and the decision in State v. Taylor, supra, rather plainly foreboded the holding later forthcoming that each grade of felonious homicide should be set out in a separate count. We cannot doubt that the purpose of the proviso was to preclude that necessity. Otherwise it would be of small importance in criminal pleading. For many years an indictment for murder had been sufficient to put one on trial for manslaughter. The latter was still available to the state if it failed in its proof of malice. The accused might invoke it defensively. The judge might submit it and the jury convict of it, though the state claimed that it had proven malice and the accused claimed that he had shown self-defense. State v. Smith, 26 N. M. 482, 194 P. 869. The procedure was well understood, convenient, practicable, and, so far as we know, satisfactory. The Legislature determined to revert to it. "Necessarily included" fairly, though perhaps not best, expresses the relation between manslaughter and murder. The meaning attributed to it in Oklahoma exposition and application does not change the common-law rule in homicide cases.

Finding nothing in the new point raised to warrant a rehearing, we conclude that the motion should be denied.

WATSON, C. J., and SADLER, BICKLEY, and ZINN, JJ., concur.